UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION


CHARLIE JONES,

            Petitioner,                  CIVIL ACTION NO. 07-12958

        v.                     DISTRICT JUDGE ROBERT H. CLELAND

CAROL HOWES,                MAGISTRATE JUDGE VIRGINIA M. MORGAN

            Respondent.

_____/

## REPORT AND RECOMMENDATION

## I. Introduction

      This 28 U.S.C. § 2254 case comes before the court on Petitioner's Application for Writ of Habeas Corpus (D/E #1).  For the reasons stated below, this court recommends that petitioner's application for a writ of habeas corpus be **DENIED**.

## II. Background

### A. Pretrial Proceedings

      Petitioner was arrested and charged with armed robbery, M.C.L. § 750.529, felon in possession of a firearm, M.C.L. § 750.224f, and possession of a firearm during the commission of a felony, M.C.L. § 750.227b.  (Saginaw County Docket Sheet, attached as Exhibit #1 to D/E #9)

-1-

On November 8, 2000, the date originally scheduled for the preliminary examination, the Honorable Terry L. Clark, District Judge in the 70th Judicial District Court for the County of Saginaw, instead held a hearing on petitioner's motion for a line-up.  (Hearing, November 8, 2000; attached as Exhibit 2 to D/E #9)[1]  At that hearing, petitioner's attorney William White argued that petitioner was requesting a line-up because identification of the suspect was crucial and there had been some conflicting information given by witnesses.  (Hearing, November 8, 2000, p. 3)  The prosecutor opposed the motion because it was his understanding from the detectives involved in the case that petitioner had changed his appearance since the time of the incidents by shaving his head and growing a beard.  (Hearing, November 8, 2000, p. 4)  Mr. White then responded: "My client would indicate that right after he was arrested the Buena Vista Police Department took pictures of him after he was first arrested, and what he looked at, at that time, and he would be satisfied with a photographic line-up even."  (Hearing, November 8, 2000, p. 4)  The prosecutor did not object and Judge Clark adjourned the case for purpose of the photographic line-up.  (Hearing, November 8, 2000, p. 4)

On November 16, 2000, Judge Clark held a preliminary examination at the request of the prosecutor.  (Preliminary Examination, p. 3; attached as Exhibit 3 to D/E #9)  At that examination, both Nikedra Williams and Mary Jane Harris identified petitioner as the man who had robbed the store at which they were working.  (Preliminary Examination, pp. 8-10, 19-20 )  Harris also testified that, at a photographic line-up the day before, she identified someone other

---

[1]This court would note that the transcript of the hearing on petitioner's motion for a line-up, as well as the transcripts of later proceedings, refer to other cases involving petitioner.  Those other cases involved an attempted murder charge and another armed robbery charge against petitioner.  (Hearing, November 8, 2000, p. 3)

than petitioner as the man who robbed the store.  (Preliminary Examination, pp. 22-23)

Following testimony and argument, as well as a stipulation regarding petitioner's criminal

record,  Judge Clark ruled that there was probable cause to believe that petitioner had committed

all three offenses.  (Preliminary Examination, p. 24)

On April 24, 2001, the Honorable Lynda L. Heathscott, Circuit Judge for the Circuit

Court for the County of Saginaw, held a hearing with respect to the cases against petitioner.

(Hearing, April 24, 2001; attached as Exhibit 4 to D/E #9)  At that hearing, petitioner's attorney

Gust Triantafillou indicated that there were some outstanding discovery issues.  (Hearing, April

24, 2001, p. 6)  Judge Heathscott and Mr. Triantafillou then discussed the scheduling of

petitioner's cases, with Judge Heathscott ultimately rejecting petitioner's request to waive his

right to speedy trials so long as the case 00-019293-FC-3 was commenced first.  (Hearing, April

24, 2001, pp. 5-7)  After Judge Heathscott indicated that would not accept any conditions that

that plaintiff either waives his right to a speedy trial or does not waive his right, Mr. Triantafillou

told petitioner on the record:

> What she's saying is that you can't make a conditional waiver.
> She won't accept it.  If you want to waive, then they're going to set
> cases according to the way they set cases.  Traditionally, it's the
> low number that goes first.  All right.  So you want to start this
> Thursday?"

(Hearing, April 24, 2001, pp. 7-8)  Petitioner then indicated that he wanted to start case no. 00-

019293-FC-3, the attempted murder case, on Thursday as scheduled and that he was waiving his

right to a speedy trial on the other two cases set for that day.  (Hearing, April 24, 2001, p. 8)

On May 21, 2001, Judge Heathscott held a hearing on the government's motion to amend the Information by adding a second offense notice as it relates to the felony-firearm charge against petitioner. (Hearing, May 21, 2001, p. 3; attached as Exhibit 5 to D/E #9) At that hearing, Mr. Triantafillou argued that this case had been set for trial and that any amendment should have been done long ago, but Judge Heathscott granted the motion. (Hearing, May 21, 2001, pp. 3-4)

On June 26, 2001, the parties again appeared before Judge Heathscott. (Hearing, June 26, 2001; attached as Exhibit 6 to D/E #9) At that time, the prosecutor noted that, while June 26th was the date scheduled for trial, petitioner's two remaining cases had been resolved. (Hearing, June 26, 2001, pp. 3-4) According to the prosecutor, petitioner would plead guilty as charged in case 00-19335-FC-3 and, in exchange for that plea, the government would move to dismiss case 00-019354-FC-3 while recommending a three-year minimum sentence on the armed robbery charge. (Hearing, June 26, 2001, pp. 3-4) Judge Heathscott then stated:

> One of his priors is an armed robbery and you're recommending a cap of three years? Two of his priors are armed robbery. No, I'm not going to take a cap of three years. I'm not going to do it. So does that mean there will be a trial?

(Hearing, June 26, 2001, p. 4) After some discussion, Mr. Triantafillou indicated that the prosecutor had some problems with subpoenas that might complicate producing witnesses, Mr. Triantafillou had a vacation scheduled to start the next week, and petitioner wished to bring some issues to the attention of the court through motions. (Hearing, June 26, 2001, pp. 4-5) Mr. Triantafillou also stated that he had discussed with petitioner the possibility that the case would be put over to the next term and that petitioner had indicated a willingness to waive his right to a

-4-

speedy trial.  (Hearing, June 26, 2001, p. 5)   In response to questioning from Judge Heathscott,

petitioner then agreed to an adjournment and waived his right to a speedy trial.  (Hearing, June

26, 2001, pp. 5-6)

On September 11, 2001, the date set for trial, Judge Heathscott held another hearing in

this matter.  (Hearing, September 11, 2001; attached as Exhibit 7 to D/E #9)  At that hearing, Mr.

Triantafillou stated that, while there were videotapes of the alleged robberies, the prosecutor has

failed to provide him with copies of the tapes.  (Hearing, September 11, 2001, p. 3)  Mr.

Triantafillou also stated that, while the prosecutor had offered to show him the tapes that

morning, a previous prosecutor had indicated in June of 2001 that the tapes had been lost and

were not available.  (Hearing, September 11, 2001, p. 3)  Mr. Triantafillou further stated that the

tapes had apparently been found at some point, but he had not been notified until last week.

(Hearing, September 11, 2001, pp. 3-4)  According to Mr. Triantafillou, after being so notified,

he requested an opportunity to view the tapes and the prosecutor indicated that a special

projection device was needed.  (Hearing, September 11, 2001, p. 4)   Mr. Triantafillou then

requested that the cases be dismissed or the trial date adjourned.  (Hearing, September 11, 2001,

p. 4)

The prosecutor responded that he was new to the case, but there was nothing in the file

asking for copies of the tapes or to see them.  (Hearing, September 11, 2001, pp. 4-5)  The

prosecutor also requested that one of the cases, the one at issue in this petition for writ of habeas

corpus, start trial that day as the tape was only thirty seconds long.  (Hearing, September 11,

2001, p. 5)  The prosecutor further stated that, although he called Mr. Triantafillou last week to

see if Mr. Triantafillou had seen the tape, Mr. Triantafillou only called him at five minutes

before five p.m. the day before.  (Hearing, September 11, 2001, p. 6)  Judge Heathscott stated

that she had reviewed the files and did not see anything in them requesting the tapes, but Mr.

Triantafillou then identified such a request, while also conceding that he had only called the

prosecutor the day before.  (Hearing, September 11, 2001, pp. 6-7)  Judge Heathscott also stated

that the prosecution had been negligent in only making it known a week before trial that the

tapes had been found while Mr. Triantafillou had also been negligent in waiting until the

afternoon before trial before requesting the tapes again.  (Hearing, September 11, 2001, p. 8)

Judge Heathscott subsequently denied petitioner's motion in light of the short duration of

the tape in this case and the fact that the police reports clearly described what the tape depicted.

(Hearing, September 11, 2001, pp. 8-9)  Petitioner then stated on his own behalf that he was

being rushed into trial, but Judge Heathscott disagreed.  (Hearing, September 11, 2001, p. 9)

However, while trial was set to start that day, it did not begin and there is no reason given in the

record.  This court would note that the date petitioner's trial was set to start  was also the date of

the September 11th terrorist attacks.

On November 9, 2001, Judge Heathscott held a hearing on petitioner's motion to adjourn.

(Hearing, November 9, 2001; attached as Exhibit 8 to D/E #9)  At that hearing, Mr. Triantafillou

stated that, while the trial was set to start on November 14, 2001, he was requesting an

adjournment because petitioner wanted him to file a number of motions, including a motion to

disqualify Judge Heathscott and a motion for Mr. Triantafillou to withdraw as defense attorney.

(Hearing, November 9, 2001, p. 3)  Judge Heathscott then asked petitioner if he understood that

he has a right to a speedy trial and that he was waiving that right by agreeing to an adjournment. (Hearing, November 9, 2001, p. 5)  Petitioner stated that he understood.  (Hearing, November 9, 2001, p. 5)

On February 4, 2002, Judge Heathscott held a hearing on petitioner's motions.  (Hearing, February 4, 2002; attached as Exhibit 9 to D/E #9)  With respect to petitioner's motion to disqualify Judge Heathscott, Mr. Triantafillou argued that, by refusing to allow plea bargaining, Judge Heathscott had shown a personal animus against petitioner while also prejudicing petitioner.  (Hearing, February 4, 2002, p. 3)  Judge Heathscott disagreed and denied the motion. (Hearing, February 4, 2002, pp. 4-5)  With respect to Mr. Triantafillou's motion to withdraw as petitioner's attorney, he argued that he and petitioner could not agree on any kind of approach to defending petitioner.  (Hearing, February 4, 2002, pp. 5-6)  Judge Heathscott noted that Mr. White, petitioner's prior attorney, had the same problem.  (Hearing, February 4, 2002, p. 6) Judge Heathscott also advised petitioner that, after a second attorney is appointed by the court following the withdrawal of the first attorney, it is her policy to deny any subsequent motions for withdrawals based on personality conflicts.  (Hearing, February 4, 2002, p. 6)  The motion to withdraw was denied.  (Hearing, February 4, 2002, p. 6)

Later in the hearing, Mr. Triantafillou informed the court that petitioner wished to personally conduct his own defense and that petitioner believed he had an absolute right to do so. (Hearing, February 4, 2002, p. 8)  Judge Heathscott responded:

> All right.  I'm going to have you file a motion in that regard, Mr.
> Triantafillou.  Even if the Court were to allow [petitioner] some
> limited self-representation, the Court would not allow you to

> withdraw.  So, if you'll file a motion so that the Court can read
> these cases and let the prosecutor respond."

(Hearing, February 4, 2002, p. 8)

Petitioner also had a motion to suppress the photograph identification and in-court

identifications based on the photograph identification  (Hearing, February 4, 2002, p. 8) and,

while some testimony was taken (Hearing, February 4, 2002, pp. 9-10), it became clear that the

matter was going to have to be adjourned because not all of the evidence was at hand and not all

of the witnesses were available (Hearing, February 4, 2002, pp. 11-12).  The hearing was set to

resume the next day.  (Hearing, February 4, 2002, pp. 14-15)

On February 11, 2002, the Honorable Leonard P. Borrello, Circuit Judge in the Circuit

Court for the County of Saginaw, held a hearing on petitioner's appeal from Judge Heathscott's

denial of petitioner's motion to disqualify.  (Hearing, February 11, 2002, p. 3; attached as

Exhibit 10 to D/E #9)  In support of the motion to disqualify, Mr. Triantafillou argued that Judge

Heathscott had a personal animus against petitioner and should be disqualified.  (Hearing,

February 11, 2002, pp. 3-4)  The prosecutor responded that there was no evidence of animus or

bias on the part of Judge Heathscott.  (Hearing, February 11, 2002, p. 5)  Judge Borrello noted

that a judge does not have to accept a plea bargain and denied petitioner's motion.  (Hearing,

February 11, 2002, pp. 6-8)

Also on February 11, 2002, Judge Heathscott held a hearing regarding petitioner's case.

After learning of Judge Borello's decision, Judge Heathscott stated: "All right.  This matter is set

for tomorrow.  We are in trial, so this case is necessarily going to be adjourned because we are in

-8-

session from - - a trial carrying over from last week.  So this matter will be reset then."

(Hearing, February 11, 2002, p. 3; attached as Exhibit 11 to D/E #9)

On May 13, 2002, the Honorable Robert L. Kaczmarek, Circuit Judge in the Circuit

Court for the County of Saginaw, held a hearing on Mr. Triantafillou's motion to withdraw as

defense attorney and petitioner's motion to represent himself.  (Hearing, May 13, 2002, p. 2;

attached as Exhibit 12 to D/E #9)  As noted by Mr. Triantafillou:

> These motions were originally brought before the Honorable Linda
> L. Heathscott.  She has since removed herself from the case on a
> motion to have her remove herself as a judge on the case because
> of personal animus toward [petitioner].  The case has been
> reassigned to this Court and so I am renewing my motions.

(Hearing, May 13, 2002, p. 2)  Mr. Triantafillou also stated that petitioner was unsatisfied with

Mr. Triantafillou's performance, Mr. Triantafillou did not want to represent petitioner anymore,

and Mr. Triantafillou did not believe he and plaintiff could work together.  (Hearing, May 13,

2002, p. 2)  Petitioner also stated that he and Mr. Triantafillou never had a relationship and they

had never discussed trial strategy.  (Hearing, May 13, 2002, p. 3)  Judge Kaczmarek granted the

motion to withdraw.  (Hearing, May 13, 2002, p. 3)  Judge Kaczmarek also ruled: 'As for the

motion for self-representation, I'll deny it.  We'll appoint somebody else and go from there."

(Hearing, May 13, 2002, p. 2)  Judge Kaczmarek then set the trial for two months later in order

to give the new attorney ample time to get ready.  (Hearing, May 13, 2002, p. 4)

On September 17, 2002, Judge Kaczmarek held a hearing on petitioner's motion to

suppress the in-court identification.  (Hearing, September 17, 2002, p. 4; attached as Exhibit 13

to D/E #9)  At that hearing, William White testified that he had previously represented petitioner

and that, at one point, he determined that a line-up procedure should be done to ensure a positive

identification of petitioner before the witnesses were allowed in court.  (Hearing, September 17,

2002, pp. 5-6)  White also testified that, with respect to the line-up, he agreed to an

accommodation with the prosecutor due to the fact that petitioner's appearance had changed

since the date of petitioner's arrest and that the accommodation agreed to was a photographic

line-up.  (Hearing, September 17, 2002, pp. 6-8)  Mr. White further testified that, relying on a

representation from the prosecutor that the photograph of petitioner was petitioner's booking

photograph, he was satisfied with the six photographs used provided a fair line-up.  (Hearing,

September 17, 2002, pp. 8-9)  According to Mr. White, he was present on November 15, 2000

when Mary Harris and Nikedra Williams were separately shown the photographic line-up and

that Detective James Baker did not interact with either witness, other than giving them basic

instructions and showing them the photographs, while the each witness was in the room.

(Hearing, September 17, 2002, pp. 9-13, 24)  Mr. White further testified that he did not object to

anything at the time of the line-up because he thought Detective Baker had handled everything

properly.  (Hearing, September 18, 2002, p. 4)

　　　Officer James Edward Baker also testified at the hearing.  (Hearing, September 17, 2002,

p. 34)  According to Officer Baker, he was the detective assigned to the robbery in this case and

that, because petitioner had changed his appearance following the arrest by shaving his head and

altering his facial hair, Baker was instructed by the court to prepare a photographic line-up.

(Hearing, September 17, 2002, pp. 38-43)  Baker also testified that, when White made the

request for a line-up, Harris and Williams, the two witnesses, were out in the hall.  (Hearing,

-10-

September 17, 2002, pp. 56-58)  In making the photographic line-up, Baker used the picture of

petitioner taken on the date of his arrest and five other photographs a secretary gathered by

feeding in certain criteria into a computer.  (Hearing, September 17, 2002, pp. 45-46)  According

to Baker, the photographs used were approved by a prosecutor.  (Hearing, September 17, 2002,

p. 47)  Baker testified that he did not speak with the witnesses beyond telling them he was going

to give them a form on which to make a determination.  (Hearing, September 17, 2002, p. 48)

Baker also testified that the witnesses were given a previewing statement to read, which they did,

and that Baker did not indicate to either Harris or Williams if they had picked out petitioner.

(Hearing, September 17, 2002, pp. 48-49)

Mary Jane Harris testified at the hearing that she works at Wonderland Beauty and

Barber Supply and that she was present during an armed robbery that occurred on October 23,

2000.  (Hearing, September 17, 2002, pp. 62-63)  Harris had never seen the man who robbed the

store prior to that incident.  (Hearing, September 17, 2002, p. 70)  Harris also testified that, at

some point after the robbery, she went to the police station and identified some items.  (Hearing,

September 17, 2002, pp. 64-65)  Harris further testified that she was later subpoenaed and went

to the courthouse, but that she never went in a courtroom.  (Hearing, September 17, 2002, pp. 64,

66)  According to Harris, at some point after she went to the courthouse, she was called into the

police station in order to look at some pictures and mark an "X" in front of the picture of the

robber.  (Hearing, September 17, 2002, pp. 68-69)  Harris marked picture number four, which

she later learned was not petitioner.  (Hearing, September 17, 2002, pp. 69. 78)  Harris did

identify petitioner as the man who had robbed the store at the preliminary examination, where

petitioner was wearing orange and seated in the courtroom.  (Hearing, September 17, 2002, pp.

76-77)  According to Harris, she recognized petitioner even though he looked different than he

did on the day of the robbery and petitioner's picture in the photographic line-up, picture number

five, was not a good picture of petitioner.  (Hearing, September 17, 2002, pp. 75-77)  Harris also

testified that she could identify petitioner now based on the robbery.  (Hearing, September 17,

2002, p. 79)

    Nikedra Williams testified that she worked at Wonderland Beauty and Barber Supply on

October 23, 2000 and was present during the robbery that occurred on that date.  (Hearing,

September 17, 2002, pp. 81-82)  Williams also testified that she had never seen the robber before

that day and that she looked at the robber for three to four minutes while he was in the store.

(Hearing, September 17, 2002, pp. 84, 86)  Williams further testified that, at some point

following the robbery, she was subpoenaed to come to court, but the matter was adjourned and

she did not see petitioner there.  (Hearing, September 17, 2002, pp. 89-90)  According to

Williams, she was also asked to come to the police station in order to look at a group of

photographs.  (Hearing, September 17, 2002, pp. 86-87)  Williams identified picture number

five, which was petitioner's photograph, as a photograph of the man who had robbed the store,

but she was not told if she had picked the "right" person that day.  (Hearing, September 17,

2002, pp. 87, 92)  Ms. Williams also identified petitioner as the robber during the preliminary

hearing.  (Hearing, September 17, 2002, pp. 85-86)

    On the basis of the above testimony, petitioner's third attorney, George C. Bush, argued

that the identifications of petitioner should be suppressed while the prosecutor asserted that there

were no improper procedures used.  (Hearing, September 17, 2002, pp. 94-103)  Judge

Kaczmarek stated that he believed that the procedure used was fair and that the individuals used

in the line-up appear to be approximately the same age as petitioner and have the same general

facial structure.  (Hearing, September 17, 2002, pp. 103-104)  Judge Kaczmarek also stated that

the only issue was the prior misidentification of petitioner by Harris, but that could be covered

by a jury instruction and, in any event, it only goes to the weight of the evidence.  (Hearing,

September 17, 2002, p. 104)  Therefore, Judge Kaczmarek denied petitioner's motion to

suppress.  (Hearing, September 17, 2002, p. 104)

### B. Petitioner's Trial

Petitioner's trial began on September 18, 2002.  (Trial - Volume I, September 18, 2002;

attached as Exhibit 14 to D/E #9)  At the beginning of the trial, Mr. Bush, petitioner's attorney,

stated that, at the conclusion of the evidentiary hearing the day before, petitioner had provided

him with a list of six witnesses, four of whom were not local.  (Trial - Volume I, p. 3)  Mr. Bush

also stated that he had not had an opportunity to contact those witnesses and he requested a

postponement.  (Trial - Volume I, p. 3)  In response, the prosecutor asserted that there was no

reason to postpone the case while noting that the government had requested the names of all of

petitioner's witnesses months ago and that petitioner chose to delay giving the names to his third

attorney until the day of trial.  (Trial - Volume I, pp. 4-6)  Judge Kaczmarek denied the motion

after noting that the government had requested the names of all petitioner's witnesses on

December 11, 2000.  (Trial - Volume I, p. 6)  Following jury selection (Trial - Volume I, pp.

-13-

13-106), the prosecutor gave his opening statement (Trial - Volume I, pp. 110-122) while

defense counsel chose to reserve his opening statement until later (Trial - Volume I, p. 122).

At the beginning of the next day of trial (Trial - Volume II, September 19, 2002; attached

as Exhibit 15 to D/E #9), Mr. Bush stated: "Your Honor, my client has requested that I place on

the record his objection to the jury selection process, and his position is that there was an

underrepresentation of minorities on the group Q, T, U forms from which this jury was selected,

and we want it noted for the record." (Trial - Volume II, p. 4) The Court noted the objection

while stating that the "jury was pulled by the names -- same driver's license method. I don't

know what else to say. Sometimes you have different people, and it's hard to -- we don't pick

them out by having X number of males, females, blacks, whites, Hispanics. It's whatever license

numbers come up." (Trial - Volume II, p. 4)

Both Mary Jane Harris and Nikeda Williams testified at petitioner's trial that they were

working at the Wonderland Beauty and Barber Supply on October 23, 2000 in the middle of the

afternoon, when petitioner came into the store. (Trial - Volume II, pp. 8-9, 39, 49-50, 65-66)[2]

According to Williams, petitioner asked if the store had any Diane hair brushes and she directed

him to the front, where Harris helped him. (Trial - Volume II, pp. 53-54) Harris also testified

that petitioner had a black do-rag on his head, had on dark sunglasses, and was wearing a black

suede jacket and dark pants. (Trial - Volume II, p. 10) Harris further testified that petitioner was

---

[2]Harris also testified that, at the earlier photographic line-up, she had identified a person
other than petitioner. Harris further testified that she recognized petitioner as the robber, even
though his appearance had changed. (Trial - Volume II, pp. 35-37, 39)

not wearing gloves, he had some facial hair, and could see some hair under his do-rag as well. (Trial - Volume II, p. 26)

Harris further testified that she asked if she could help petitioner, he said he wanted a "Diane brush", she described the differences among those brand of brushes, and the petitioner picked one out. (Trial - Volume II, pp. 10-11) Harris also testified that, once they got to the register, she rung up the price and put the brush in a small plain white bag. (Trial - Volume II, p. 15) According to Harris, as she was putting the brush in a bag, petitioner pulled out a pistol and pointed it at her. (Trial - Volume II, pp. 15-16) The pistol was semiautomatic, and it was either silver or chrome colored. (Trial - Volume II, p. 17) Petitioner told Harris to give her all the money in the register, except for the coins, and she put the money, including larger bills, in the bag. (Trial - Volume II, p. 18) Petitioner took the brush as well. (Trial - Volume II, p. 25)

Harris also testified that petitioner then put the gun back behind his back and told her to go to the back of the store. (Trial - Volume II, pp. 19-20) Petitioner watched her for a little and then went to the door. (Trial - Volume II, p. 20) As she was walking to the back, Harris told Williams to hit the panic button located in the store. (Trial - Volume II, pp. 21, 56) Williams had not been watching the interaction between Harris and petitioner, but she pushed the panic button as instructed. (Trial - Volume II, pp. 55-57) Williams never observed a weapon or any money being taken. (Trial - Volume II, pp. 66, 68-69)

According to Harris, she then walked into the office and switched the store's security television to the outside camera in order to see if the robber was walking or driving. (Trial - Volume II, pp. 21-22) On the screen, a car drove off. (Trial - Volume II, p. 22)

-15-

James Baker testified that he was a detective with the Buena Vista Police Department on October 23, 2000 and that he responded to a 911 call regarding a robbery on that day.  (Trial - Volume II, pp. 75-76)  According to Baker, he interviewed Harris briefly, but did not speak to Williams because she was too upset.  (Trial - Volume II, p. 77)  Baker also watched the video from the store's security camera and got a description of robber and the vehicle.  (Trial - Volume II, (pp. 77-79)  The robber was a black male in dark coat or dark shirt, also wearing a do-rag and dark glasses while the car was a dark colored Oldsmobile with a luggage rack.  (Trial - Volume II, pp. 78-79).

Baker also testified that he was driving home that night in the detective's car assigned to him, with another officer, when he decided to take a look around a high crime area.  (Trial - Volume II, pp. 80-81)  According to Baker, he then observed a dark colored Oldsmobile with a silver luggage rack driving down a road about an hour after the robbery occurred.  (Trial - Volume II, pp. 82, 84)  Baker did a u-turn and started following the Oldsmobile.  (Trial - Volume II, pp. 87-88)  The Oldsmobile then sped off and turned a corner while Baker followed and radioed the police dispatch.  (Trial - Volume II, p. 89)  Other police cars joined the chase and, eventually, the Oldsmobile crashed.  (Trial - Volume II, p. 95)

Baker testified that petitioner was the driver of the Oldsmobile, he matched description of the robber, and Baker placed petitioner under arrest.  (Trial - Volume II, pp. 97-98, 117)  According to Baker, petitioner may have been under the influence of something as his eyes were sleepy, he was slow moving, and he was sweating.  (Trial - Volume II, pp. 98-99)  Petitioner was searched and he had a state of New York identification on him, as well as a black brush.  (Trial -

-16-

Volume II, p. 99)  During the trial, Harris identified the brush in evidence as same as one stolen

while Williams recognized it as the type of brush their store sold.  (Trial - Volume II,  (pp. 27,

52)

Baker also testified that the police found a white plastic bag and glasses on the floorboard

area in front of passenger seat of the car, and a black suede coat and do-rag on passenger's seat

itself.  (Trial - Volume II, pp. 105, 107-109)  According to Harris, the sunglasses in evidence

look like petitioner's, the plastic bag in evidence was the same type of bag taken in robbery, and

the suede jacket in evidence was the jacket the robber was wearing.  (Trial - Volume II, pp.

27-30)  The only funds seized from petitioner were eight one-dollar bills.  (Trial - Volume II, p.

129)  Baker did not find a gun.  (Trial - Volume II, p. 139)

Baker further testified that the police made copies of petitioner's fingerprints, Harris'

fingerprints, and Williams' fingerprints.  (Trial - Volume II, pp. 111, 130, 133)   According to

Baker, a laboratory specialist said there was a latent print on white plastic bag that could be

compared to petitioner's and Harris' prints, but comparison has not been done and investigation

was still ongoing.  (Trial - Volume II, pp. 131-134)

At the start of the third day of trial (Trial - Volume III, September 20, 2002; attached as

Exhibit 16 to D/E #9), the prosecutor requested a continuance in order to get the laboratory

results of the fingerprint analysis, but the court denied that request.  (Trial - Volume III, pp. 3-4)

Petitioner then moved for a directed verdict of not guilty on all three counts on the basis

that insufficient evidence had been produced.  (Trial - Volume III, pp. 10-11)  In response to that

motion, the prosecutor argued that the eyewitness testimony and other evidence was sufficient to

support convictions on all three counts.  (Trial - Volume III, pp. 11-13)  The court ruled: "Taking

the evidence in a light most favorable to the nonmoving party and giving every reasonable

inference, I'm going to deny the motion."  (Trial - Volume III, p. 13)

Following closing arguments (Trial - Volume III, pp. 14-59) and jury instructions (Trial -

Volume III, pp. 60-76), the jury rendered its verdict and found petitioner guilty on all three

counts (Trial - Volume III, pp. 80-81).

### C. Post-judgment Proceedings

Petitioner's case  was set for sentencing on November 4, 2002, but was adjourned at

defendant's request because of defendant's objections to the Sentencing Information Report had

not yet been resolved.  (Hearing, November 4, 2002, p. 2; attached as Exhibit 17 to D/E #9)

On November 5, 2002, petitioner was sentenced to 360 to 600 months imprisonment for

the armed robbery conviction, 60 to 120 months imprisonment for the felon in possession of a

firearm conviction, and a consecutive sentence of 24 months imprisonment for the felony-

firearm conviction.  (Judgment of Sentence, attached as part of Exhibit 19 to D/E #9)

Petitioner then appealed his convictions to the Michigan Court of Appeals.  Through an

attorney, petitioner raised five issues:

> I.. THE TRIAL JUDGE VIOLATED DEFENDANT JONES'
> CONSTITUTIONAL, STATUTORY, AND RULE-BASED
> RIGHTS TO REPRESENT HIMSELF BY SUMMARILY
> REJECTING MR. JONES' REQUEST FOR
> SELF-REPRESENTATION AND BY NOT FOLLOWING THE
> RULES FOR ADVISING MR. JONES OF HIS RIGHT TO
> REPRESENT HIMSELF.

II. MR. JONES WAS DENIED HIS CONSTITUTIONAL AND
STATUTORY RIGHTS TO A SPEEDY TRIAL, AND HIS
RIGHT TO EFFECTIVE ASSISTANCE OF COUNSEL.

A. DEFENDANT WAS TRIED IN VIOLATION OF THE
180-DAY RULE.

B. DEFENDANT WAS DENIED HIS CONSTITUTIONAL
RIGHT TO A SPEEDY TRIAL.

C. DEFENDANT WAS DENIED EFFECTIVE ASSISTANCE OF
COUNSEL BY HIS ATTORNEY'S FAILURE TO ARGUE AND
OBTAIN A RULING ON DEFENDANT'S MOTION TO
DISMISS.

III. DEFENDANT WAS DENIED DUE PROCESS OF LAW
WHERE HIS REQUEST FOR A CORPOREAL LINEUP WAS
DENIED, A PHOTOGRAPHIC IDENTIFICATION
PROCEDURE WAS CONDUCTED WHILE HE WAS IN
CUSTODY, AND HIS IDENTIFICATION AT THE
PRELIMINARY EXAMINATION WAS UNDULY
SUGGESTIVE; THERE WAS NO INDEPENDENT BASIS FOR
THE IN-COURT IDENTIFICATIONS.

A. DENIAL OF THE CORPOREAL LINEUP AND THE USE OF
THE PHOTOGRAPHIC SHOW-UP DENIED DEFENDANT
DUE PROCESS.

B. THE IDENTIFICATION OF DEFENDANT AT THE
PRELIMINARY EXAMINATION, AFTER THE
IDENTIFICATION OF SOMEONE ELSE AT THE PHOTO ID,
WAS UNDULY SUGGESTIVE.

C. THE IN-COURT IDENTIFICATIONS DID NOT HAVE AN
INDEPENDENT BASIS.

D. ADMISSION OF THE IN-COURT IDENTIFICATIONS WAS
HIGHLY PREJUDICIAL TO MR. JONES.

IV. DEFENDANT WAS DENIED HIS CONSTITUTIONAL
RIGHT TO PRESENT A DEFENSE WHEN THE TRIAL
COURT DENIED HIS REQUEST FOR A CONTINUANCE IN

ORDER TO SECURE THE PRESENCE OF DEFENSE
WITNESSES.

V. THE PROSECUTOR'S FAILURE TO TIMELY COMPLY
WITH DISCOVERY DENIED MR. JONES A FAIR TRIAL.

(Petitioner's Brief on Appeal; attached as part of Exhibit 19 to D/E #9)

Petitioner also raised the following three issues in an *in propria persona* brief:

I. THE TRIAL COURT COMMITTED REVERSIBLE ERROR
WHEN THE COURT OVERRULED
DEFENDANT-APPELLANT'S OBJECTION TO THE
UNDER-REPRESENTATION OF AFRICAN-AMERICANS IN
HIS JURY POOL, DENYING HIM HIS RIGHT TO A
IMPARTIAL JURY AND EQUAL PROTECTION, AS
GUARANTEED UNDER THE SIXTH AND FOURTEENTH
AMENDMENT.

II. TRIAL COUNSEL DENIED DEFENDANT-APPELLANT
HIS RIGHT TO EFFECTIVE ASSISTANCE OF COUNSEL, AS
GUARANTEED UNDER THE SIXTH AMENDMENT, WHEN
HE FAILED TO OBJECT TO NUMEROUS INSTANCES OF
PROSECUTORIAL MISCONDUCT WHEN THE
PROSECUTOR CONTINUALLY INFERRED THAT THE
DEFENDANT-APPELLANT WAS A DRUG ADDICT,
INDIRECTLY IMPLYING MOTIVE, AFTER FORMALLY
STATING TO THE COURT THAT HE WOULD NOT
MENTION THIS.

B. (sic) TRIAL COUNSEL DENIED
DEFENDANT-APPELLANT HIS RIGHT TO EFFECTIVE
ASSISTANCE OF COUNSEL, AS GUARANTEED UNDER
THE SIXTH AMENDMENT, WHEN HE FAILED TO OBJECT
TO THE PROSECUTOR WITHHOLDING EVIDENCE,
BREAKING THE CHAIN OF EVIDENCE, AND FAILING TO
CALL A LOCAL NEWS STATION TECHNICIAN, WHO WAS
ALLEGED TO HAVE ENHANCED THE QUALITY OF
SOUND, OF THE VIDEOTAPE OF THE CRIME, DENYING
THE DEFENDANT-APPELLANT HIS DUE PROCESS RIGHT
TO CONFRONTATION.

III. THE CUMULATIVE EFFECT OF THE ERRORS THAT
ARE SET FORTH BOTH IN THIS BRIEF AND THE
DEFENDANT-APPELLANT'S INITIAL RIGHT TO APPEAL
BRIEF, DENIED HIM DUE PROCESS AND RIGHT TO A FAIR
TRIAL.

(Petitioner's Standard 11 Brief on Appeal, attached as part of Exhibits 18 and 19 to D/E #9).

On April 22, 2004, the Michigan Court of Appeals issued an opinion rejecting all of

petitioner's arguments and affirming the convictions.  People  v. Jones, No. 245056 (Mich. Ct.

App. April 22, 2004) (attached as part of Exhibit 18 to D/E #9)

Petitioner presented the same issues in his application for leave to appeal to the Michigan

Supreme Court, and that application was also denied.  People v Jones, No. 126204 (Mich.

October 25, 2004) (attached as part of Exhibit 20 to D/E #9)

Following that appeal, petitioner filed a motion for relief from judgment and, in that

motion, petitioner made the following two claims:

I. EXCULPATORY EVIDENCE WAS SUPPRESSED AT
TRIAL, DENYING DEFENDANT DUE PROCESS OF LAW,
AND A LABORATORY REPORT NOT AVAILABLE UNTIL
AFTER DEFENDANT'S CONVICTION REVEALS FURTHER
EXCULPATORY EVIDENCE; DEFENDANT IS ENTITLED TO
A NEW TRIAL.

II. DEFENDANT WAS DENIED HIS SIXTH AMENDMENT
RIGHT TO EFFECTIVE ASSISTANCE OF COUNSEL WHERE
THERE IS NEWLY-DISCOVERED EVIDENCE THAT HIS
TRIAL ATTORNEY FAILED TO INVESTIGATE AND
PRODUCE WITNESSES ON HIS BEHALF.

(Petitioner's Motion for Reconsideration, attached as part of Exhibit 22 to D/E #9)

Petitioner's motion for reconsideration was denied by the trial court for failing to meet

the requirements of MCR 6.508(D), *i.e.* good cause for failing to raise the issues in his appeal

and actual prejudice from the alleged irregularities.   (Opinion and Order, No 00-019335-FC-2

(Saginaw County Circuit Court, March 21, 2006) (attached as part of Exhibit 22 to D/E #9)

Petitioner's subsequent applications for leave to appeal the denial of his motion for

reconsideration were denied by both the Michigan Court of Appeals and the Michigan Supreme

Court "for failure to meet the burden of establishing entitlement to relief under MCR 6.508(D)."

People v Jones, No 269510 (Mich. Ct. App. October 26, 2006) (attached as part of Exhibit 22 to

D/E #9); People v. Jones, No 132919 (Mich. May 30, 2007) (attached as part of Exhibit 23 to

D/E #9).

### D. Petition for Writ of Habeas Corpus

On July 16, 2007, petitioner filed the petition for writ of habeas corpus pending before

the court (D/E #1).  In that petition, petitioner argues that (1) the trial court violated petitioner's

constitutional right to self-representation; (2) petitioner was denied his right to a speedy trial; (3)

petitioner was denied his right to due process when his request for a corporeal line-up was

denied; (4) petitioner was denied his right to present a defense when the trial court denied

petitioner's request for a continuance; (5) petitioner was denied a fair trial by the prosecution's

failure to provide discovery; (6) petitioner was denied his right to an impartial jury and his right

to equal protection when the trial court overruled his objection to the jury pool; (7) petitioner

wad denied the effective assistance of counsel by trial counsel's failure to object to improperly

admitted evidence; (8) the cumulative effect of all the errors require that petitioner's convictions

be vacated; (9) petitioner was denied due process of law by the suppression of exculpatory

evidence during the trial; (10) petitioner was denied his right to effective assistance of counsel

when his trial counsel failed to investigated newly-discovered evidence or produce witnesses on petitioner's behalf; and (11) petitioner was denied his right of confrontation by the admission of hearsay testimony regarding fingerprints.

On March 19, 2008, respondent filed a response to petitioner's petition for writ of habeas corpus (D/E #8).  In that response, respondent argues that petitioner failed to demonstrate a constitutional violation in his first eight issues and that he procedurally defaulted in his last three issues.

On June 3, 2009, petitioner filed a reply to the response to his petition for writ of habeas corpus in which he reiterates his earlier arguments (D/E #12).

On January 8, 2009, this matter was referred to this court for all pretrial proceedings and a report and recommendation on the petition for writ of habeas corpus (D/E #15).  Following that referral, this court denied petitioner's request for appointment of counsel (D/E #17) and petitioner's motion to compel to discovery (D/E #23).

## III. Standard of Review

Petitioner is not entitled to the writ of habeas corpus unless he can show that the state court's adjudication of his claims on the merits "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  28 U.S.C. § 2254(d).

A state court's decision is "contrary to" clearly established federal law "if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts."  Williams v. Taylor, 529 U.S. 362, 412-13 (2000).  A state court's decision is an "unreasonable application of" clearly established federal law "if the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case."  Williams, 529 U.S. at 413.  "Avoiding these pitfalls does not require citation of [Supreme Court] cases-indeed, it does not even require awareness of [Supreme Court] cases, so long as neither the reasoning nor the result of the state-court decision contradicts them."  Early v. Packer, 537 U.S. 3, 8 (2002) (per curiam opinion) (emphasis in original).

**IV. Discussion**

   **A. Self-representation**

Petitioner first argues that he was deprived of his right, derived from the Sixth Amendment, to represent himself at trial.  Although courts are most frequently called upon to deal with and to enforce the Sixth Amendment guaranty that every criminal defendant facing potential incarceration has the right to counsel at all "critical stages" of the criminal process, United States v. Wade, 388 U.S. 218, 223-27, 87 S.Ct. 1926, 18 L.Ed.2d 1149 (1967); Argersinger v. Hamlin, 407 U.S. 25, 92 S.Ct. 2006, 32 L.Ed.2d 530 (1972), the Constitution also affords-with equal importance-the right to self-representation, Faretta v. California, 422 U.S. 806, 95 S.Ct. 2525, 45 L.Ed.2d 562 (1975).  Those two rights are mutually exclusive, and

invocation of one is necessarily intertwined with waiver of the other.   Just as had earlier been

done with the right to counsel, Gideon v. Wainwright, 372 U.S. 335, 83 S.Ct. 792, 9 L.Ed.2d 799

(1963), Faretta incorporated against the states a criminal defendant's right to self-representation

via the Fourteenth Amendment's Due Process Clause.  Faretta, 422 U.S. at 819-20, 95 S.Ct.

2525 (footnote omitted).  Waiver of the right to counsel by an accused must be knowing,

voluntary and intelligent.  Johnson v. Zerbst, 304 U.S. 458, 464-65, 58 S.Ct. 1019, 82 L.Ed.

1461 (1938)).  For any such waiver to be effective, the accused "should be made aware of the

dangers and disadvantages of self-representation, so that the record will establish that 'he knows

what he is doing and his choice is made with eyes open'"  Faretta, 422 U.S. at 835 (quoting

Adams v. United States ex rel. McCann, 317 U.S. 269, 279, 63 S.Ct. 236, 87 L.Ed. 268 (1942)).

In light of petitioner's motion to the court proposing self-representation, it would have

been preferable to hold a full-blown hearing but, as the Sixth Circuit has held, "Faretta

procedures are only required when a defendant has clearly and unequivocally asserted his right

to proceed *pro se*."  United States v. Cromer, 389 F.3d 662, 682 (6th Cir. 2004).

Here, petitioner's statements may have been "clear" but, when viewed in context, they

were not altogether "unequivocal."  Petitioner only moved to proceed *pro se* after Judge

Heathscott indicated that she would not grant the withdrawal of the second attorney appointed to

petitioner because of mere personality conflicts.  (Hearing, February 4, 2002, pp. 6, 8; attached

as Exhibit 9 to D/E #9)   In response to that oral motion by petitioner, Judge Heathscott

requested a written motion and brief.  (Hearing, February 4, 2002, p. 8; attached as Exhibit 9 to

D/E #9)  However, Judge Heathscott subsequently disqualified herself from petitioner's case, the

-25-

case was assigned to Judge Kaczmarek, and Mr. Triantafillou renewed his motion to withdraw.

Judge Kaczmarek granted the motion to withdraw while also ruling: 'As for the motion for self-

representation, I'll deny it.  We'll appoint somebody else and go from there."  (Hearing, May 13,

2002, pp. 2-3; attached as Exhibit 12 to D/E #9)  Judge Kaczmarek then set the trial for two

months later in order to give the new attorney ample time to get ready.  (Hearing, May 13, 2002,

p. 4; attached as Exhibit 12 to D/E #9)

      In response to the assignment of a third attorney, petitioner made no further protestation,

nor did he give any indication that he wished to proceed *pro se*.  Nor did petitioner make any

such indication at any later date or during his trial.  It is difficult, therefore, to conclude that

petitioner "clearly and unequivocally asserted his right to proceed *pro se*."  Based on the facts in

this record, the acquiescence of petitioner in representation by his newly appointed attorney

should be considered a waiver by conduct of the right to self-representation.

### B. Speedy Trial

      Petitioner next contends that the delay between his arrest and trial violates the Sixth

Amendment's speedy-trial guarantee.  The Sixth Amendment guarantees that, "[i]n all criminal

prosecutions, the accused shall enjoy the right to a speedy and public trial." U.S. Const. amend.

VI.  Unlike the Speedy Trial Act, which protects against delay from the time of indictment or

appearance, the Sixth Amendment protects against delay from the time of arrest when it precedes

the indictment or appearance.  See Dillingham v. United States, 423 U.S. 64, 65, 96 S.Ct. 303, 46

L.Ed.2d 205 (1975) (measuring delay for Sixth Amendment claim from time of arrest and noting

that "[i]nvocation of the speedy trial provision ... need not await indictment, information, or other formal charge")

The Supreme Court in Barker v. Wingo, 407 U.S. 514, 530, 92 S.Ct. 2182, 33 L.Ed.2d 101 (1972), established a four-factor test for evaluating a Sixth Amendment speedy-trial claim: (1) length of delay; (2) the reason for the delay; (3) the defendant's assertion of his right; and (4) prejudice to the defendant.  None of these four factors is "a necessary or sufficient condition to the finding of a deprivation of the right of speedy trial.  Rather, they are related factors and must be considered together with such other circumstances as may be relevant."  Barker, 407 U.S. at 533.

The first factor, length of the delay, is a triggering mechanism: "Simply to trigger a speedy trial analysis, an accused must allege that the interval between accusation and trial has crossed the threshold dividing ordinary from 'presumptively prejudicial' delay, since, by definition, he cannot complain that the government has denied him a 'speedy' trial if it has, in fact, prosecuted his case with customary promptness."  Doggett v. United States, 505 U.S. 647, 651-52, 112 S.Ct. 2686, 120 L.Ed.2d 520 (1992).  The Sixth Circuit "has found that a delay is presumptively prejudicial when it approaches one year."  United States v. Gardner, 488 F.3d 700, 719 (6th Cir. 2007) (citing United States v. Schreane, 331 F.3d 548, 553 (6th Cir. 2003)). And although the Sixth Circuit has also indicated that an eight-month delay would suffice to meet this first factor, see, e.g., Jackson, 473 F.3d at 665 (quoting law-review article cited in Doggett that states "[t]here seems general agreement that any delay of eight months or longer is 'presumptively prejudicial' "), it has also held that a delay of approximately nine months was not

-27-

presumptively prejudicial, at least where the matter involved "multiple defendants and pre-trial motions," see Gardner, 488 F.3d at 719.  Here, this court will assume without deciding that the nearly twenty-three month delay is presumptively prejudicial and address the remaining factors, which, as discussed below, outweigh that presumption.

The second Barker factor focuses on the reason for the delay.  Not all delays are susceptible to equal blame. See Barker, 407 U.S. at 531 (explaining that "different weights should be assigned to different reasons"). Governmental delays motivated by bad faith, harassment or attempts to seek a tactical advantage weigh heavily against the government.  See Barker, 407 U.S. at 531.  See also United States v. Marion, 404 U.S. 307, 325, 92 S.Ct. 455, 30 L.Ed.2d 468 (1971) (harassment is an improper reason for delay); United States v. White, 985 F.2d 271, 275 (6th Cir. 1993) ("Delays intended to secure a tactical advantage weigh heavily against the government.").  "A more neutral reason such as negligence or overcrowded courts should be weighted less heavily but nevertheless should be considered since the ultimate responsibility for such circumstances must rest with the government rather than with the defendant."  Barker, 407 U.S. at 531; see also Strunk v. United States, 412 U.S. 434, 436, 93 S.Ct. 2260, 37 L.Ed.2d 56 (1973) (understaffed prosecutor's office is a neutral reason for delay). A "valid reason" for a delay, such as an unavailable witness, weighs in favor of the government. See Barker, 407 U.S. at 531; see also Takacs v. Engle, 768 F.2d 122, 128 (6th Cir. 1985) (explaining that a valid delay "weighs in favor of the government").

Here, the reasons for the delay weigh against finding a Sixth Amendment violation. Although the burden of excusing delay rests with the government, see Rudstein et al., supra, ¶

-28-

11.01[1] & n. 155 (citing Barker, 407 U.S. at 531), "it cannot be presumed that the government

acted with an improper motive," id. ¶ 11.01[1], and there is no indication here that the delay was

motivated by bad faith or an attempt to gain tactical advantage.  Moreover, much of the delay

here is attributable to petitioner. For example, trial adjournments were granted on November 8,

2000, in order to conduct the photographic line-up requested by petitioner, and June 26, 2001,

pursuant to a request by petitioner following rejection of the plea. The trial was set to go

September 11, 2001, over the objection of the petitioner, but appears to have been adjourned

because of the terrorist attacks that occurred that day.  Moreover, petitioner requested another

adjournment on November 9, 2001 in order to file a number of motions, including his counsel's

motion to withdraw and a motion to disqualify Judge Heathscott.  Those motions were not

resolved until May 13, 2002, at which point Judge Kaczmarek appointed a new attorney for

plaintiff and adjourned the case another two months in order to give the new attorney time to

prepare.[3]

The third Barker factor examines the defendant's assertion of his right to a speedy trial.

"The defendant's assertion of his speedy trial right ... is entitled to strong evidentiary weight in

determining whether the defendant is being deprived of the right."  Barker, 407 U.S. at 531-32.

The Barker Court "emphasize[d] that failure to assert the right will make it difficult for a

defendant to prove that he was denied a speedy trial."  Barker, 407 U.S. at 532.  As discussed

above, petitioner never asserted his speedy-trial rights prior to trial.  To the contrary, plaintiff

expressly waived his right to a speedy trial on several occasions while arguing that he was being

---

[3]While petitioner's motions were still pending, the trial was set to begin on February 12,
2002.  On that day, the court adjourned the matter because of its own docket.

rushed into trial at other times.  In fact, plaintiff requested another continuance at the start of his trial.  This factor therefore weighs heavily toward a conclusion that no Sixth Amendment violation occurred.

The fourth factor, prejudice to the defendant, "should be assessed in light of the interests of defendants [that] the speedy trial right was designed to protect."  Barker, 407 U.S. at 532. The Supreme Court in Barker identified three of these interests: (1) to prevent oppressive pretrial incarceration; (2) to minimize anxiety and concern of the accused; and (3) to limit the possibility that the defense will be impaired.  Barker, 407 U.S. at 532.  "Of these, the most serious is the last, because the inability of a defendant adequately to prepare his case skews the fairness of the entire system."  Barker, 407 U.S. at 532.

In this case, whatever prejudice exists is minimal. First, no prejudice arose from petitioner's pretrial incarceration because even if he had not been detained in this case, he would have been in custody for the other armed-robbery case pending in Michigan.  Second, any anxiety or concern petitioner experienced here would fall short of that deemed insufficiently prejudicial in Barker, where the defendant waited more than five years from arrest to trial. Barker, 407 U.S. at 533-34. Third, plaintiff was not impaired by any delay in trial and nothing suggests he was unable to adequately prepare his case because of any delay.  Rather, as discussed above, petitioner actually requested another adjournment on the eve of trial.

On balance, the Barker factors show that petitioner's speedy-trial rights were not violated.  While a significant amount of time passed between petitioner's arrest and trial, much of the delay was caused by petitioner and he expressly waived his right to speedy trial on several

-30-

occasions.  Moreover, petitioner was not prejudiced by the delay.  Accordingly, no Sixth

Amendment violation occurred.

### C. Corporeal Line-up

Petitioner's third claim is that the police should have conducted a corporeal lineup rather

than a photographic array.  The Michigan Court of Appeals rejected this claim, stating:

> in this case, defendant's attorney actually *suggested* and *agreed* to
> a photographic lineup.  A party may not stipulate a matter or waive
> objection and then argue on appeal that the resultant action was
> error.  *People v Aldrich*, 246 Mich. App. 101, 11; 631 NW2d 67
> (2001).  Therefore, this claim must also fail.

People  v. Jones, No. 245056 (Mich. Ct. App. April 22, 2004) (attached as part of Exhibit 18 to

D/E #9).

Federal courts ordinarily "will not review a question of federal law decided by a state

court if the decision of that court rests on a state law ground that is independent of the federal

question and adequate to support the judgment."  Howard v. Bouchard, 405 F.3d 459, 475 (6th

Cir.2005) (quoting Coleman v. Thompson, 501 U.S. 722, 729, 111 S.Ct. 2546, 115 L.Ed.2d 640

(1991).  For purposes of procedural default, the federal court is concerned with the "last

explained state court judgment."  Howard, 405 F.3d at 475-76 (quoting Munson v. Kapture, 384

F.3d 310, 314 (6th Cir. 2004)). Here, the Michigan Court of Appeals ruling is clearly the last

explained state court judgment and it expressly relied on plaintiff's failure to preserve his

argument in the lower court.  The Sixth Circuit has previously held that a contemporaneous

objection rule constitutes an adequate and independent state ground that bars federal habeas

review absent a showing of cause and prejudice.  Hinkle v. Randle, 271 F.3d 239, 244 (6th Cir. 2001).

Given that this claim is procedurally defaulted, petitioner "waived the right to federal habeas review unless [he] can demonstrate cause for noncompliance and actual prejudice arising from the alleged constitutional violation, or a showing of a fundamental miscarriage of justice." Hinkle, 271 F.3d at 244-45 (quoting Simpson v. Jones, 238 F.3d 399, 406 (6th Cir. 2000) (internal quotation marks omitted)).  However, petitioner makes no attempt to show cause, prejudice, or a miscarriage of justice that would excuse the procedural default and the court should deny relief on this claim.  See Henderson v. Kibbe, 431 U.S. 145, 154, 97 S.Ct. 1730, 52 L.Ed.2d 203 (1977) ("It is the rare case in which an improper instruction will justify reversal of a criminal conviction when no objection has been made in the trial court.").

Moreover, even petitioner's argument was not defaulted, it still must be rejected.  In Simmons v. United States, 390 U.S. 377, 384-86, 88 S.Ct. 967, 19 L.Ed.2d 1247 (1968), the United States Supreme Court acknowledged that a corporeal identification is usually more accurate than a photographic identification, but affirmed the propriety of photographic arrays, relying upon "a course of cross-examination at trial which exposes to the jury the method's potential for error" and explicitly declining "to prohibit its employment, either in the exercise of our supervisory power or, still less, as a matter of constitutional requirement." Simmons, 390 U.S. at 384.  Federal courts have since held that a criminal defendant has no constitutional right to a corporeal line-up.  See, *e.g.*, United States v. Storer, 956 F.2d 1169, 1992 WL 45764, *2

(9th Cir.1992) (unpublished); <u>Branch v. Estelle</u>, 631 F.2d 1229, 1234 (5th Cir.1980); <u>Payne v. Smith</u>, 207 F.Supp.2d 627, 644 -645 (E.D. Mich.,2002) (O'Meara, J.).

Although an accused does not have a right to counsel at a photographic lineup, an accused is nevertheless entitled to due process protection against the introduction of evidence of, or tainted by, an unreliable identification elicited through an unnecessarily suggestive photographic display. <u>United States v. Ash</u>, 413 U.S. 300, 320, 93 S.Ct. 2568, 37 L.Ed.2d 619 (1973). In this case, however, petitioner does not assert any facts, nor is there any evidence, indicating that the photographic array was unduly suggestive. Further, even assuming that the array was improper or suggestive, there was no basis to suppress the in-court identifications of petitioner. An in-court identification by a witness need not be excluded when it can be established that the identification has an independent origin untainted by the suggestive pre-trial identification procedures. <u>See</u>, *e.g.*, <u>United States v. Wade</u>, 388 U.S. 218, 87 S.Ct. 1926, 18 L.Ed.2d 1149 (1967). In this case, both Ms. Harris and Ms. Williams established an independent basis for their identification of petitioner as the man who robbed their store. Petitioner's claim is therefore without merit and does not warrant habeas relief.

### D. Continuance

Petitioner also argues that the trial court violated his constitutional rights by denying his motion for a continuance prior to the start of trial. The Sixth Circuit has previously construed similar claims as alleging a due process violation, <u>see</u> <u>Powell v. Collins</u>, 332 F.3d 376, 396 (6th Cir. 2003). A trial court's denial of a continuance rises to the level of a constitutional violation only where there is "an unreasoning and arbitrary 'insistence upon expeditiousness in the face of

a justifiable request for delay.'"  Morris v. Slappy, 461 U.S. 1, 11-12, 103 S.Ct. 1610, 75

L.Ed.2d 610 (1983) (quoting Ungar v. Sarafite, 376 U.S. 575, 589, 84 S.Ct. 841, 11 L.Ed.2d 921

(1964)); United States v. Moreno, 933 F.2d 362, 371 (6th Cir. 1991).  "There are no mechanical

tests for deciding when a denial of a continuance is so arbitrary as to violate due process.  The

answer must be found in the circumstances present in every case, particularly in the reasons

presented to the trial judge at the time the request is denied."  Ungar, 376 U.S. at 589.  The Sixth

Circuit has considered the following factors in determining whether an accused was deprived of

his right to due process by a denial of a motion for a continuance: "the diligence of the defense

in interviewing witnesses and procuring their presence, the probability of procuring their

testimony within a reasonable time, the specificity with which the defense is able to describe

their expected knowledge or testimony, the degree to which such testimony is expected to be

favorable to the accused, and the unique or cumulative nature of the testimony."  Bennett v.

Scroggy, 793 F.2d 772, 774 (6th Cir.1986) (quoting Hicks v. Wainwright, 633 F.2d 1146, 1149

(5th Cir.1981)) (internal quotation marks omitted).  See also Mackey v. Dutton, 217 F.3d 399,

408 (6th Cir. 2000).  Moreover, to obtain habeas relief, it is not sufficient for the petitioner to

show that the trial court arbitrarily denied the continuance request; he "must also show that the

denial of a continuance actually prejudiced his ... defense."  Burton v. Renico, 391 F.3d 764, 772

(6th Cir. 2004). "Actual prejudice may be demonstrated by showing that additional time would

have made relevant witnesses available or otherwise [would have benefitted] the defense."

Powell v. Collins, 332 F.3d 376, 396 (6th Cir. 2003).

In this case, petitioner's claim that the trial court violated his constitutional rights by denying his request for a continuance should be rejected. Petitioner has not demonstrated that he made a "justifiable request" for a continuance, see Slappy, 461 U.S. at 11-12, 103 S.Ct. 1610; he was not diligent and waited until the eve of trial to inform his third attorney about potential witnesses, he did not state with any specificity or provide any information relating to the content of the potential witnesses' testimony, and there is no indication that the potential witnesses' testimony was unique or favorable to petitioner.

**E. Suppression of Evidence (I)**

In his first suppression of evidence claim, petitioner argues that the government committed a "Brady[4] violation" by (1) failing to timely turn over the videotape taken from the store's security system evidence and (2) by failing to timely disclose that the fingerprint analysis was incomplete.

With respect to those arguments, the Michigan Court of Appeals held:

> Nor do we find error in the trial court's refusal to dismiss the case based on the prosecutor's alleged failure to timely comply with discovery. The videotape of the robbery was made available to the defense on September 11, 2001, more than a year before trial. Any delay in turning over the tape was harmless. Defendant also claims the prosecution failed to disclose a lack of fingerprint evidence. However, under *United States v Bagley*, 473 U.S. 667; 105 S. Ct. 3375; 87 L. Ed. 2d 481 (1985), evidence must be material for a party to allege error based on nondisclosure. "The evidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *Id.* at 682. Defendant has not made this showing.

---

[4]Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963).

-35-

People v. Jones, No. 245056 (Mich. Ct. App. April 22, 2004) (attached as part of Exhibit 18 to D/E #9).

That decision is consistent with federal law and constitutes a reasonable application of that law.  In Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), the Supreme Court held "that the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution."  Brady, 373 U.S. at 87.  "'There are three components of a true Brady violation: the evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued.'"  Owens v. Guida, 549 F.3d 399, 415 (6th Cir. 2008) (quoting Strickler v. Greene, 527 U.S. 263, 281-82, 119 S.Ct. 1936, 144 L.Ed.2d 286 (1999)).  A defendant is prejudiced when there is "a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different."  Kyles v. Whitley, 514 U.S. 419, 433-34, 115 S.Ct. 1555, 131 L.Ed.2d 490 (1995) (quoting United States v. Bagley, 473 U.S. 667, 682, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985)).

Here, even assuming *arguendo* that the prosecution should have been more timely in disclosing the evidence, there was clearly no ensuing prejudice.  Petitioner was provided the videotape on September 11, 2001 and his trial did not begin until September 18, 2002, which was over a year later.  Similarly, petitioner's attorney was able to elicit testimony that there were no identifiable fingerprints taken from the bag and that petitioner's fingerprints had not been

showed to be a match.  Petitioner cannot show that there was "a reasonable probability that, had

the evidence been disclosed to the defense, the result of the proceeding would have been

different" and, therefore, he was not prejudiced .  Kyles, 514 U.S. at 433-34.

### F. Equal Protection

Petitioner, who is black, asserts that he was denied an impartial jury drawn from a fair

cross-section of the community where no black jurors served on his jury.  With respect to that

argument, the Michigan Court of Appeals held:

> Next, defendant demands reversal of his conviction because there
> were no African Americans on his jury, despite the fact that they
> allegedly comprise 17.77 percent of Saginaw County's population.
> Although the underrepresentation was regrettable, we find no
> constitutional violation.  "To establish a prima facie violation of
> the fair cross-section requirement, a defendant must show that . . .
> the underrepresentation was the result of systematic exclusion of
> the [distinctive] group from the jury-selection process."  *People v
> Smith*, 463 Mich. 199, 203; 615 N.W.2d 1 (2000), citing *Duren v
> Missouri*, 439 U.S. 357, 364; 99 S. Ct. 664; 58 L. Ed. 2d 579
> (1979).  Defendant's naked assertion that such underrepresentation
> "often happens in Saginaw" is not sufficient to prove systematic
> exclusion.  Moreover, the juror selection process used by Saginaw
> County in this case was upheld by our Supreme Court in *Smith*,
> *supra* at 209.

People  v. Jones, No. 245056 (Mich. Ct. App. April 22, 2004) (attached as part of Exhibit 18 to

D/E #9).

The Michigan Court of Appeals' decision was not an unreasonable application of clearly

established federal law.  Under the Sixth Amendment, a criminal defendant is entitled to a trial

"by an impartial jury of the State and district wherein the crime shall have been committed."

U.S. Const. amend. VI.  In Taylor v. Louisiana, 419 U.S. 522, 95 S.Ct. 692, 42 L.Ed.2d 690

(1975), the Supreme Court held that the Sixth Amendment right to an impartial jury includes the right to a jury drawn from a fair cross-section of the community.  Taylor, 419 U.S. at 530.  The Court, however, "impose[d] no requirement that petit juries actually chosen must mirror the community and reflect the various distinctive groups in the population."  Taylor, 419 U.S. at 538.

Although a defendant has no right to a petit jury composed in whole or in part of persons of his or her own race, he or she does have the right to be tried by a jury whose members are selected by indiscriminatory criteria.  Powers v. Ohio, 499 U.S. 400, 404, 111 S.Ct. 1364, 113 L.Ed.2d 411 (1991) (internal citations omitted).  While states may prescribe relevant qualifications for their jurors, members of a community may not be excluded from jury service on account of their race.  Powers, 499 U.S. at 404.  A defendant, however, may not challenge the makeup of a jury merely because no members of his or her race are on a jury, but must prove that his or her race has been systematically excluded.  Apodoca v. Oregon, 406 U.S. 404, 413, 92 S.Ct. 1628, 32 L.Ed.2d 184 (1972); Johnson v. Hofbauer, 159 F.Supp.2d 582, 598-99 (E.D. Mich. 2001) (Tarnow, J.).

In order to establish a prima facie violation of the fair cross-section requirement, a defendant must show: (1) that the group alleged to have been excluded is a 'distinctive group' in the community; (2) that the representation of that group in venires from which juries are selected is not fair and reasonable in relation to the number of such persons in the community; and (3) that the underrepresentation is due to the systematic exclusion of the group in the jury selection process.  Duren v. Missouri, 439 U.S. 357, 364, 99 S.Ct. 664, 58 L.Ed.2d 579 (1979).  "More

than mere numbers must be provided to establish" that members of a particular ethnic or racial group are systematically underrepresented in the jury venire.  United States v. Greene, 971 F.Supp. 1117, 1128 (E.D. Mich. 1997) (Rosen, J.).  The strength of the evidence of underrepresentation of the group in the venire is only one factor to be considered in determining whether a prima facie violation of the fair cross-section requirement has been established. Factors such as the nature of the process by which jury lists are composed and the length of time of underrepresentation, together with the strength of the evidence that purports to establish unfair and unreasonable representation also need to be examined.  Greene, 971 F.Supp.at 1128. (citing to Ford v. Seabold, 841 F.2d 677 (6th Cir. 1988)).

In this case, petitioner has not provided any evidence to show the under-representation of blacks on jury venires in general or any evidence that any alleged under-representation was due to systematic exclusion.  He only makes bare assertions and such assertions are insufficient to show that the Michigan Court of Appeals' decision was an unreasonable application of clearly established federal law.

### G. Ineffective Assistance of Counsel (I)

In his first ineffective assistance of counsel claim, petitioner argues that he was denied the effective assistance of counsel when his trial counsel failed to object to (1) testimony regarding the possibility that petitioner was on drugs when arrested and (2) the introduction of the videotape as evidence.

The right to the effective assistance of counsel is guaranteed by the Sixth Amendment to the United States Constitution.  Maples v. Stegall, 340 F.3d 433, 437 (6th Cir. 2003) (citing Roe

v. Flores-Ortega, 528 U.S. 470, 476, 120 S.Ct. 1029, 145 L.Ed.2d 985 (2000).  A petitioner must

satisfy a two-prong test to prevail on an ineffective-assistance-of-counsel claim.  First, the

petitioner must show that the performance of counsel fell "below an objective standard of

reasonableness."  Strickland v. Washington, 466 U.S. 668, 687-94, 104 S.Ct. 2052, 80 L.Ed.2d

674 (1984).  In so doing, the petitioner must rebut the presumption that counsel's "challenged

action might be considered sound trial strategy."  Strickland, 466 U.S. at 689 (internal quotation

marks omitted).  In evaluating an ineffective-assistance-of-counsel claim, a court strongly

presumes that counsel has "rendered adequate assistance and made all significant decisions in

the exercise of reasonable professional judgment."  Strickland, 466 U.S. at 690.  As a result,

petitioners alleging ineffective assistance of counsel bear "a heavy burden of proof."  Whiting v.

Burt, 395 F.3d 602, 617 (6th Cir. 2005).

Second, the petitioner alleging the ineffective assistance of counsel must demonstrate

prejudice.  Strickland, 466 U.S. at 694.  To satisfy the prejudice prong, petitioner "must show

that there is a reasonable probability that, but for counsel's unprofessional errors, the result of

the proceeding would have been different."  Strickland, 466 U.S. at 694.  "A reasonable

probability is a probability sufficient to undermine confidence in the outcome."  Strickland, 466

U.S. at 694.

Here, while petitioner argues that his trial counsel was ineffective for failing to make

objections, any such objections would have been futile and the failure to make futile objections

cannot constitute deficient performance.  See United States v. Steverson, 230 F.3d 221, 225 (6th

Cir. 2000).  For example, while petitioner argues that his trial counsel should have objected to

comments by the prosecutor that suggested that petitioner was a drug user after stipulating that evidence of drug paraphernalia would not be introduced, there was no such stipulation as to petitioner's demeanor and petitioner offers no other reason why such testimony would be objectionable.  (Trial - Volume II, pp. 7, 98-99).  Similarly, while petitioner argues that trial counsel should have objected to the admission of the videotape, both Harris and Williams verified the accuracy of the tape as well as the still photographs taken from it.  (Trial - Volume II, pp. 30-32, 126-127).

Moreover, even assuming trial counsel's performance was deficient , petitioner was not prejudiced by any failure to object.  As discussed above, to satisfy the prejudice prong, petitioner "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."  Strickland, 466 U.S. at 694.  Here, two eyewitnesses identified petitioner as the man who robbed the store and he was found with the type of clothes the robber was wearing, as well as the same types of items taken from the store, just one hour after the robbery occurred.

### H. Cumulative Effect

Petitioner also argues that the cumulative effect of the above errors requires that the court vacate his convictions.  However, constitutional claims that would not individually support habeas relief may be cumulated in order to support relief.  See Moore v. Parker, 425 F.3d 250, 256-257 (6th Cir. 2005); Scott v. Elo, 302 F.3d 598, 607 (6th Cir. 2002).

### I. Suppression of Evidence (II)

-41-

In his second suppression of evidence claim, petitioner argues that, following his conviction and sentence, he learned that the prosecution had suppressed the existence of an earlier laboratory report.  Petitioner also argues that a second laboratory report was completed after his trial was finished and that the second report should be the basis for a new trial. Petitioner raised theses arguments in his motion for reconsideration, but, as argued by respondent, petitioner's argument was procedurally defaulted and should not be considered by this court.

A procedural default is "a critical failure to comply with state procedural law ...."  Trest v. Cain, 522 U.S. 87, 89, 118 S.Ct. 478, 139 L.Ed.2d 444 (1997).  "Federal courts must consider four factors when assessing whether a habeas petitioner has procedurally defaulted his claims." Beuke v. Houk, 537 F.3d 618, 630 (6th Cir. 2008) (citing Gonzales v. Elo, 233 F.3d 348, 353 (6th Cir. 2000), and Maupin v. Smith, 785 F.2d 135, 138 (6th Cir. 1986)):

> First, the court must determine that there is a state procedural rule that is applicable to the petitioner's claim and that the petitioner failed to comply with the rule.  Second, the court must decide whether the state courts actually enforced the state procedural sanction.  Third, the court must decide whether the state procedural forfeiture is an "adequate and independent" state ground on which the state can rely to foreclose review of a federal constitutional claim.

Beuke, 537 at 630 (quoting Jacobs v. Mohr, 265 F.3d 407, 417 (6th Cir. 2001) (quoting Maupin, 785 F.2d at 138)).

In Beuke, the Sixth Circuit also held:

> "Once the court determines that a state procedural rule was not complied with and that the rule was an adequate and independent state ground," the court must move to the fourth factor. *Maupin*,

-42-

> 785 F.2d at 138. The fourth factor allows a petitioner to avoid or excuse procedural default if he demonstrates "that there was cause for him to not follow the procedural rule and that he was actually prejudiced by the alleged constitutional error." *Id.* (quotation omitted).

Beuke, 537 at 630 .

The state procedural rule in question here is Michigan Court Rule 6.508(D).[5]  Subsection

(3) of Rule 6.508(D) prohibits state courts from granting relief from judgment if the defendant

---

[5]M.C.R. 6.508(D) reads:

(D) Entitlement to Relief. The defendant has the burden of establishing entitlement to the relief requested. The court may not grant relief to the defendant if the motion

(1) seeks relief from a judgment of conviction and sentence that still is subject to challenge on appeal pursuant to subchapter 7.200 or subchapter 7.300;

(2) alleges grounds for relief which were decided against the defendant in a prior appeal or proceeding under this subchapter, unless the defendant establishes that a retroactive change in the law has undermined the prior decision;

(3) alleges grounds for relief, other than jurisdictional defects, which could have been raised on appeal from the conviction and sentence or in a prior motion under this subchapter, unless the defendant demonstrates

(a) good cause for failure to raise such grounds on appeal or in the prior motion, and

(b) actual prejudice from the alleged irregularities that support the claim for relief. As used in this subrule, "actual prejudice" means that,

(i) in a conviction following a trial, but for the alleged error, the defendant would have ad a reasonably likely chance of acquittal;

....

The court may waive the "good cause" requirement of subrule (D)(3)(a) if it concludes that there is a significant possibility that the defendant is innocent of the crime.

-43-

alleges nonjurisdictional grounds that could have been raised on appeal from the conviction or sentence. An exception exists when the defendant demonstrates "good cause for failure to raise such grounds on appeal" and "actual prejudice from the alleged irregularities that support the claim for relief." M.C R. 6.508(D)(3).

"Whether a state court has actually enforced a procedural sanction depends on whether 'the last state court from which the petitioner sought review ... invoked the stated procedural rule as a basis for its decision to reject reviewing the petitioner's federal claims.'" Ivory v. Jackson, 509 F.3d 284, 291 (6th Cir. 2007), quoting Abela v. Martin, 380 F.3d 915, 921 (6th Cir. 2004). "[A] procedural default does not bar consideration of a federal claim on either direct or habeas review unless the last state court rendering a judgment in the case " 'clearly and expressly' " states that its judgment rests on a state procedural bar." Harris v. Reed, 489 U.S. 255, 263, 109 S.Ct. 1038, 103 L.Ed.2d 308 (1989) (quoting Caldwell v. Mississippi, 472 U.S. 320, 327, 105 S.Ct. 2633, 86 L.Ed.2d 231 (1985) quoting Michigan v. Long, 463 U.S. 1032, 1041, 103 S.Ct. 3469, 77 L.Ed.2d 1201 (1983)).  Courts must "look through" unexplained orders to the last reasoned state court decision when determining whether a judgment rests on a state procedural bar. Ylst v. Nunnemaker, 501 U.S. 797, 804, 111 S.Ct. 2590, 115 L.Ed.2d 706 (1991).  If an order appears to rest primarily on federal law, a reviewing court must presume that a subsequent unexplained order did not invoke a procedural default and left the earlier order in place.  Ylst, 501 at 803.

Here, petitioner's applications for leave to appeal the denial of his motion for reconsideration were denied by both the Michigan Court of Appeals and the Michigan Supreme

Court in a form orders stating that plaintiff failed "to meet the burden of establishing entitlement to relief under MCR 6.508(D)."  People v Jones, No 269510 (Mich. Ct. App. October 26, 2006) (attached as part of Exhibit 22 to D/E #9); People v. Jones, No 132919 (Mich. May 30, 2007) (attached as part of Exhibit 23 to D/E #9).  However, at the trial court level, Judge Kaczmarek issued an detailed opinion and order denying plaintiff's motion for reconsideration for failing to meet the requirements of MCR 6.508(D), *i.e.* good cause for failing to raise the issues in his appeal and actual prejudice from the alleged irregularities.   (Opinion and Order, No 00-019335-FC-2 (Saginaw County Circuit Court, March 21, 2006) (attached as part of Exhibit 22 to D/E #9)

As discussed above, once it is determined that there is a state procedural rule that is applicable to the petitioner's claim, that the petitioner failed to comply with the rule and that the state courts actually enforced the state procedural sanction, the court must decide whether the state procedural forfeiture is an "adequate and independent" state ground on which the state can rely to foreclose review of a federal constitutional claim.  Beuke, 537 at 630.  As argued by respondent, it is well-established in the Sixth Circuit that the procedural bar set forth in Rule 6.508(D) constitutes an adequate and independent ground on which Michigan courts may rely in foreclosing review of federal claims.  See, *e.g.*, Howard v Bouchard, 405 F.3d 459, 477 (6th Cir. 2005).

In Beuke, the Sixth Circuit also held a petitioner may avoid or excuse procedural default if he demonstrates that there was cause for him to not follow the procedural rule and that he was actually prejudiced by the alleged constitutional error.  Beuke, 537 at 630.  In this case, however,

-45-

petitioner has failed to show cause, prejudice, or a miscarriage of justice that would excuse the procedural default and the court should deny relief on this claim.   As discussed by the trial court in its decision to deny petitioner's motion for reconsideration, the first laboratory report was clearly discussed during petitioner's trial while the second laboratory report, which was not completed until after the trial, merely recorded the same findings as the first report.

### J. Ineffective Assistance of Counsel (II)

In his second ineffective assistance of counsel claim, petitioner argues that his trial counsel was ineffective for failing to investigate and produce witnesses on his behalf.  However, petitioner only raised this argument in his motion for reconsideration and, for the same reasons discussed earlier, his argument is procedurally defaulted and should not be considered. Moreover, plaintiff has again failed to show cause, prejudice, or a miscarriage of justice that would excuse the procedural default as plaintiff could have sought appellate relief on this issue in his direct appeal as of right.  Additionally, petitioner fails to show how the witnesses he wished called would have changed the outcome of his trial.  As noted by the trial court, Charles North would have merely testified that he loaned petitioner his car while Pamela DeMyers would only have stated her belief that petitioner would have committed the crime for which he was convicted.

### K. Right of Confrontation

In his final issue, petitioner argues that he was denied his constitutional right to confrontation by the hearsay testimony regarding the fingerprints.  However, petitioner only raised this argument in his motion for reconsideration and it is procedurally defaulted for the

same reasons as the previous two issues.  Moreover, plaintiff has again failed to show cause, prejudice, or a miscarriage of justice that would excuse the procedural default as plaintiff could have sought appellate relief on this issue in his direct appeal as of right.  Additionally, petitioner's attorney was able to elicit testimony that there were no identifiable fingerprints taken from the bag and that petitioner's fingerprints had not been showed to be a match.

## IV. Conclusion

For the reasons stated above, this court recommends that petitioner's application for a writ of habeas corpus be **DENIED**.

The parties to this action may object to and seek review of this Report and Recommendation, but are required to act within ten (10) days of service of a copy hereof as provided for in 28 U.S.C. § 636(b)(1) and E.D. Mich. LR 72.1(d)(2).  Failure to file specific objections constitutes a waiver of any further right of appeal.  Thomas v. Arn, 474 U.S. 140 (1985); Howard v. Secretary of HHS, 932 F.2d 505, 508 (6th Cir. 1991); United States v. Walters, 638 F.2d 947, 949-50 (6th Cir. 1981).  The filing of objections which raise some issues, but fail to raise others with specificity, will not preserve all the objections a party might have to this Report and Recommendation.  Willis v. Secretary of HHS, 931 F.2d 390, 401 (6th Cir. 1991); Smith v. Detroit Fed'n of Teachers Local 231, 829 F.2d 1370, 1373 (6th Cir. 1987).  Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this magistrate judge.

Within ten (10) days of service of any objecting party's timely filed objections, the

opposing party may file a response.  The response shall be no more than 20 pages in length

unless, by motion and order, the page limit is extended by the court.  The response shall address

each issue contained within the objections specifically and in the same order raised.


<u>S/Virginia M. Morgan</u>
Virginia M. Morgan
United States Magistrate Judge

Dated: September 23, 2009

---

<u>**PROOF OF SERVICE**</u>

The undersigned certifies that the foregoing document was served upon counsel of record and plaintiff via the Court's ECF System and/or U. S. Mail on September 23, 2009.

<u>s/J. Johnson</u>
Case Manager to
Magistrate Judge Virginia M. Morgan